WESTERN ELECTRIC CO. v. ROCHESTER TELEPHONE CO. et al.

(Circuit Court, W. D. New York. September 7, 1904.)

No. 158.

1. PATENTS—INVENTION—TELEPHONE SIGNALING APPARATUS.
    The Scribner & McBerty patent, No. 559,411, for a signaling apparatus
    for telephone switchboards, is void for lack of invention, in view of the
    prior art, and especially of the O'Connell patent, No. 515,531.

In Equity.

Barton & Tanner (George P. Barton and Edward Rector, of counsel), for complainant.

Satterlee, Bissell, Taylor & French (Charles A. Brown and Charles J. Bissell, of counsel), for defendants.

HAZEL, District Judge. This suit is brought to establish infringement by the defendants of claims 1 and 3 of United States letters patent No. 559,411, granted May 5, 1896, to Charles E. Scribner and Frank R. McBerty, and subsequently assigned to the complainant corporation. The application for the patent was filed February 28, 1895. The invention relates to improvements in signaling apparatus for telephone switchboards, and, as the specification states, particularly concerns—

"A mode of operating the signals for connection and disconnection upon a switchboard in which the signals are controlled by relays in the line circuit actuated in the use of the telephones at the substations."

Its object is—

"To provide means for operating the signals for disconnection and to prevent the waste of current through these signals while they are not in use."

The specification further states that the invention is designed for use—

"In connection with telephone exchange systems in which the line circuits are normally open at the substations, but are automatically closed during the use of the telephones at the substations, and a relay is included in the line circuit at the central station to respond to currents in the line circuit; a local circuit, including the subsidiary signal, being controlled by the relay."

The patent does not relate to appliances for transmission of articulate sound. That a telephone switchboard is a complicate structure, with many parts performing different functions, may well be assumed, when it is considered that electric currents, switches, relays, or devices, by which the current flowing in one circuit opens or closes another, line signals, multiple switchboards, associated with spring jacks, contact plugs, and disconnecting signals, are employed in its construction and operation.

Claims 1 and 3, in controversy, are as follows:

"(1) The combination, with a connecting plug in a telephone switchboard, of a supervisory signal associated therewith in a circuit normally open at two points, registering contacts in the plug, and spring jack adapted to close the said circuit at one point, and a relay controlling the break at the other point, the relay being connected with the circuits of the plug to respond to current therein, substantially as described."

"(3) The combination, with a telephone line, of spring jacks forming terminals of the line, a signal connected therewith normally free to indicate cur-

rents in the line associated with one of the spring jacks, a connecting plug in a spring jack, means for preventing the display of said signal while the plug is in the spring jack, a plug circuit terminating in the plug, a clearing-out signal associated with the plug, a local circuit including the clearing-out signal completed through registering contact pieces of the spring jack and the plug, and a relay controlling the continuity of the local circuit, the relay being connected with the plug circuit to respond to currents therein through the line, substantially as described."

Claim 1 does not refer to a line signal and means for extinguishing the same, but apparently relates to the supervisory signal and the details comprising its construction. Claim 3 in detail sets forth the entire combination relating to both line and supervisory signals. The defenses are many and the record voluminous. The answer alleges want of novelty in view of the prior art, anticipation, denial of infringement, laches, etc. The proofs show that the supervisory system embodied in the switchboard of the patent in suit, with some modification, has proven its utility, and since the patent was granted has been and is now in extensive use. The record with abundant clearness and repetition asserts that the essential feature of novelty of the Scribner & McBerty patent is the supervisory signal lamp, associated with the so-styled local circuit, which is closed by the plug and spring jack contact, and controlled or directed by a relay in the circuit when connection is made. The relay is adapted to yield to the currents in such line whenever the plug is inserted in the spring jack.

To understand the claims of the patent and the various objections to its validity necessitates a statement of the nature and object of the patentees and of the state of the art at the date of the invention. It was old in the telephonic art to attract the attention of the exchange operator by means of automatic signaling. By making the proper electrical line connection, the operator was enabled to answer the call and ascertain the desire of the user of the telephone. An an early period of the art it was old to unite the lines by inserting an answering plug in the spring jack of the calling subscriber, and then by the insertion of the corresponding plug of the pair into the line spring jack of the called subscriber to enable conversation. Metal plugs for connecting the telephone lines were attached to flexible current conducting cords, conveniently arranged on the switchboard, and of a size permitting ready use by the operator. Means were also provided by the prior art for disconnecting the circuit when conversation was concluded, or, generally, to obtain the operator's attention while the lines were connected. Different methods were used for calling the telephone exchange and for disconnecting the united lines after the users completed their conversation. At an early period the signal of the district telegraph system was employed, with its messenger call box placed conveniently near the subscriber's station. Bells were also used, which were rung by a current of electricity generated by a battery or magneto. The magneto system of signaling was extensively used. This consisted of a shutter or drop controlled by an electro-magnet, which was acted upon by the current in the line circuit produced by the subscriber when he turned the crank at his end of the telephone. In short, as will

presently appear, the art of telephony had advanced a step beyond the stage of automatic line signaling in a telephone apparatus secured by lifting the receiver from the switch hook. The adaptation and practicableness of clearing out or disconnecting signals, referred to in the patent as supervisory signals, at the conclusion of conversation between connected subscribers, was the next step toward absolute perfection in the telephone system. To accomplish the result sought by the patent in suit, the telephone at the subscriber's station is removed from the hook upon which it normally rests. Instantly the hook operates as a switch, the current is closed, and a diminutive line incandescent lamp signal appears to the view of the operator. The signal lamps which are embedded in the exchange switchboard are about $1\frac{1}{2}$ inches long, and at their rounded ends about the size of a lead pencil. Ordinarily they are compactly arranged in series upon different parts of a multiple switchboard. One of the two lines leading to the subscriber's station is divided into a branch line, which contains the telephone bell. The other line connects with the telephone receiver and transmitter. According to the proofs, when the receiver is in its customary place, suspended from the hook, the line circuit is practically open through the branch line leading to the telephone bell. Hence the current does not flow from the battery through the instrument, but upon lifting the receiver from the hook the line circuit is closed. A current then passes from the common battery, f, to the subscriber's station. The line signal relay, energized by the current flowing from the battery, causes a visual lamp indicator, as above stated, to attract the attention of the operator. The current flows from a common battery, familiar to the art, through the transmitter line. This is the source of electric current supplied to the various telephone lines leading directly from the exchange.

Reference is made to the Scribner patent, No. 543,901, dated August 6, 1895, and No. 574,280, issued December 29, 1896, to Scribner & McBerty, as showing, inter alia, a common battery system giving disconnection signal by an automatic signal. A series of spring jacks separately connected with circuit conductors are arranged on a switchboard of the patent in suit. Having received the initial signal, the operator, to orally ascertain the desire of the subscriber, inserts an answering plug in the spring jack or connection socket of the calling subscriber's line. In this manner contact is made with the main line, which results in short-circuiting or extinguishing the line indicator. The insertion of the plug in the spring jack or connection socket establishes a local illuminating circuit adapted to signal the operator that the connected subscribers have completed their conversation and the lines may be disconnected. The supervisory signals, like the line signal, consists of two very small incandescent lamp lights, which are arranged in series on a switchboard. The flash of the signals is almost instantly discerned by the operator. According to the drawing of the patent, current from a separate battery, k, is supplied to operate the supervisory signal. When the plug and spring jack meet in contact, supervisory lamp, w', is lighted. Such light, how-

ever, is extinguished when the called subscriber responds and lifts his telephone from the switch hook. The connection being made, the operator switches her telephone and generator out of the circuit, and conversation may then be carried on by the persons using the telephone without interruption. It then becomes important that the operator have instant notice of the termination of the conversation, to enable her to promptly disconnect the lines. Visual notice is given of the discontinuance of the conversation by the appearance of the supervisory signals, which are independently displayed when the subscribers replace the telephone on the switch hook. The plugs may then be withdrawn and contact severed.

Formerly it was customary for the operator to break into the associated lines at intervals to inquire whether the conversation was finished. Such inquiry was made necessary by reason of the frequent omission of the subscriber to give the customary generator disconnecting or clearing-out signals at the close of the conversation. Interference or break in the lines by the operator sometimes annoyed subscribers and in some ways retarded the efficiency of the service. The proofs show that the introduction of storage batteries in telephone exchanges apparently was the first step toward bringing into the field a system of automatic disconnecting or clearing-out signals. The patent in terms claims none of the structural details as novel, except that referring to the means for energizing and de-energizing the relay in relation to the supervisory signals. The patentability of the invention is asserted on the ground that the patentees were the first to suggest an invention and system of automatic positive supervisory signals, as distinguished from negative supervisory signals of the prior art. The supervisory signal is positive when the adaptation is such that the operator is enabled to observe the lighted signal the instant any connected subscriber has signified by hanging up the telephone receiver that the conversation is finished.

Stress is placed upon the evidence of complainant's expert witness that the disconnecting signal must be not only automatic, but a positive lamp signal. Complainant insists that in the then state of the art it was invention of the highest merit, first, to prevent illumination of the lamp when the subscribers' lines were being united, and, second, to maintain such signal lamp in a state of obscuration until the end of the conversation, to be lighted only when the subscriber replaced the telephone on the switch hook. This point in controversy will doubtless appear clearer when positive and negative disconnecting signals are distinguished. A negative signal is energized when the plug is inserted in the spring jack of the called subscriber's line, and, being in the path of the electric current flowing through such line, the lamp signal is displayed. These signals, however, remained lighted during the period of connection of the lines, and disappeared only when the telephones were hung up. According to complainant the negative signal proved ineffectual, because they remained visible during the period of connection—that is, while the line was being used by the two subscribers—and disappeared when the subscribers

replaced their telephones upon the switch hook. The signal, it will be observed, was given the operator by the lights disappearing from view; hence, the designation of negative signals.

The supervisory lamp arrangement of the patent in suit and means for accomplishing the result need to be briefly described herein to enable a full and complete understanding of the effect produced. The local circuit leads from the power pole of the common battery, k, by lines 3 and 9, to the armature, v, of the relay magnet, u, where it comes in contact, v', with the illuminating lamp, w', and then with sleeve, o², which is the portion of the plug, n, that has been inserted in the subscriber's jack. Connection is then made with ring, m', and wire, 4, leading to the upper pole of the battery, k, thus completing the circuit. The accompanying drawing is illustrative of the different circuits and elements of the patent in suit:

It will be noted that lamp, w, is not illuminated by the closing of this circuit on account of the energizing of the relay magnet, u, which by contact is connected into the circuit together with battery, f, line wires, 1, 2, which, as will be observed, lead to the subscriber's telephone. It is stated in complainant's brief that:

"Inasmuch as this circuit is closed at the time through the low resistance path at the subscriber's station (owing to the fact that his telephone is off its hook), current will instantly flow from the battery, f, through said circuit, and energize the relay magnet, u, causing it to withdraw its armature from the contact, v, and open the illuminating circuit of the lamp, w, and thereby prevent the lamp from being lighted."

From what has been said, it is apparent that the essential element of the invention consists of a signaling circuit by means of which the supervisory telephone signal is associated with the initial or line signaling circuit at one point and controlled by a relay at another point. Complainant contends that, if it were not for opposing electrical forces, the mere insertion of the plug into the spring jack would instantly illuminate the supervisory signals, and to accomplish his object he energized the relay magnet, u, so as to induce the armature to withdraw from the contact, v, thereby opening the illuminating circuit and tending to overcome the initial illuminating force. In this manner the lamp is automatically prevented from lighting while the lines are connected. Was this arrangement novel in view of the prior art?

According to the complainant, as has been stated, the gist of the invention was the prevention of the illumination of the lamp during the connection of the lines by the operator and while conversation was being carried on by the subscribers, succeeded by the instantaneous display of the supervisory signal when the telephones were hung up. The testimony of complainant's expert witness, who was one of the patentees, and the skilled witness for the defendants, differ widely on important points. It is difficult, in view of the technical nature of the testimony, to determine wherein the truth lies. The issue is thought to depend for solution upon the inquiries whether the production of the signaling system disclosed in the patent in suit required invention, and, assuming its patentability, whether the defendants' system is an infringement thereof. Referring to the question of complainant's achievement, the defendants contend that nothing further was produced than a connection of the circuits of the relay and the supervisory lamp, w, with their respective main and local circuits. This result, it is claimed, involved the substitution merely of a supervisory signal organization by the insertion of a plug in the local circuit for the line signal organization familiar in the art. By such substitution of signaling contacts, the illumination is displayed on the one hand during the flow of the current and on the other when the flow is impeded. Counsel for defendants says:

"The main difference between the two—that is, between the line and supervisory branches—is that the line relay is a front contact relay and the supervisory relay is a back contact relay, in the specific system shown in the patent in suit. * * * The use of the plug, therefore, in the patent in suit, serves merely to substitute for the line signal the supervisory signal, which, like

the line signal, is connected in a local circuit, which local circuit is opened and closed by a relay, like the line relay, connected with the main circuit."

Concededly back and front contact relays were well known to electrical engineers, as may be perceived from an examination of the Scribner patent, No. 548,228, dated October 22, 1895. The defendants contend, as previously observed, that in view of the prior art no novelty is shown; that no skill is disclosed beyond that of the engineer trained in the art of telephony, to whom the results of substitution of the supervisory signal for the line signal was perfectly obvious. This defense, which is based upon many patents found in the record, among them the patents issued to Hayes, No. 474,323, dated May 3, 1892, Spencer, No. 528,040, dated October 23, 1894, Sabin & Hampton, No. 518,333, dated April 17, 1894, and O'Connell, No. 515,531, dated February 27, 1894, will now be considered.

The Hayes patent describes a common battery and means for automatic signaling. A negative disconnecting signal is displayed while the subscribers converse. It is effaced when the telephones are returned to the switch hooks. The Spencer patent also has a common battery telephone circuit and automatic signaling systems variously modified for attracting the attention of the operator. The signals are actuated by inserting plugs in the spring jacks. When the telephone is hung up, or the plug is restored to its seat, a signal is reset to show the disconnection. The specification points out the way in which the current from the battery operates to effect the signaling. The Dunbar diagrammatic drawing of lamp signals described in the Spencer patent (Fig. 7) shows a supervisory relay supplied with current to keep open the lamp circuit. An arrangement is shown by which the current does not flow through the supervisory relay while the telephone remains upon the hook. The armature of the supervisory relay is released and the supervisory lamp circuit is closed by the insertion of the plug in the spring jack, n, indicating to the operator that the called subscriber has not removed his telephone from the hook or has replaced the same thereon. Complainant denies that the Spencer method of signaling produces a positive lamp signal. The unequivocal evidence of the defendants' expert witnesses, however, supported by the specifications and drawings of the patent, apparently shows that an operative system of positive signaling may be attained by supplying the apparatus or circuit with an ordinary contact in the armature of the electro-magnets and by making the lamp connection in the local circuits. These patents showing negative signals, together with the Sabin & Hampton and Scribner, No. 548,228, quite fully disclose the state of the art at the time the patent in suit was granted.

The closest approach to the patent in suit, and that upon which defendants place great reliance, is the O'Connell patent, No. 515,531, dated February 27, 1894. This patent relates to a switch and circuit for trunk lines leading from one telephone exchange to another. A supervisory lamp signal, associated with a cord circuit, controlled at two points, is shown, one of which is normally open

at a switch contact and closed when the plug is in use. The other is controlled by a relay which is associated and connected with the cord circuit. The circuit of battery, f, when open, de-energizes the relay with which it is associated, and the lamp supervisory signals are therefore displayed to the operator as positive disconnecting signals. On the other hand, to release the relay armature closes the local circuit, the lamp is lighted, and the operator receives a positive indication that the conversation is completed. The principle of signaling there disclosed is comprehensively indicated. It is practically conceded that, if the act of the subscriber of hanging up his telephone and the act of opening the circuit by the operator are exact equivalents in the art, then the adaptation of the supervisory signals described in the O'Connell patent to the subscriber's line of the patent in suit was perfectly obvious to those skilled in telephony. Upon this point the evidence of the defendants is positive and direct. Careful consideration of all the evidence prompts the conclusion that the act of the subscriber in opening the circuit, by placing his telephone receiver on the hook switch, corresponds precisely to the act of opening a circuit by withdrawing a plug in the telephone exchange. True, the O'Connell patent has a plug seat switch, while the patent in suit has a plug and spring jack contact to open and control the local circuit. But the patent in suit expressly calls attention to the fact that other means may be employed for closing the local circuit.

Upon this point Mr. McBerty, one of the patentees, testified as follows:

"If any similarity whatever is to be assumed between the local circuit in the O'Connell system and the local lamp circuit of the patent in suit, the little switch in the plug seat in the plug shelf of the O'Connell patent must be regarded as the equivalent of the registering contacts of the plug and the spring jack of the subscriber's line in the patent in suit."

Mr. Dean, expert witness for the defendants, testified regarding the equivalency of the plug seat switch and the plug and jack contact as follows:

"The two well-known methods at that time used to accomplish this result were the three conductor jack and plug and what is known as a plug switch or seat. Some engineers preferred one method, and some the other. * * * I was familiar at the time with practically all of the apparatus in use in telephone systems."

Prof. Jackson, in comparing the O'Connell patent with claim 3 of the patent in suit, states:

"This arrangement of the local circuit for controlling the clearing-out signal, as described in claim 3 of the patent in suit, is identically the same as that described in the O'Connell patent, No. 515,531, with the exception heretofore pointed out when discussing claim 1. This exception rests in the fact that the O'Connell patent illustrates and describes the local circuit completed through a switch automatically operated by the removal of the plug from its normal seat and its return thereto. This, however, as I have heretofore clearly shown, constitutes 'other means for closing the local circuit through the conductor only during the use of the plug,' which the patent in suit admits to be the equivalent of the arrangement described in the claim, and might be substituted therefor by those skilled in the art without the exercise of invention."

Mr. Dunbar, witness for defendants, testified:

"It was understood by all telephone engineers skilled in the art, long prior to the date of the application for the patent in suit, that where a signaling circuit or other circuit was desired to be closed to a common conductor or common return when a plug was inserted into a spring jack, it could be done either by registering contact pieces provided on the plug and spring jack, or by registering contact pieces provided in a plug seat switch, or spring jack associated with the plug in its normal position."

These views find additional support and corroboration in the testimony of Mr. Lockwood, whose testimony given in another suit for infringement was by agreement brought into the record. As intimated, the whole principle of supervisory signals, or the display of a signal to the operator after the user has replaced his receiver upon the hook, is thought to be anticipated by the O'Connell patent. True, those signals were designed only for the trunk lines and to indicate a disconnection to the operator; but as a trunk line unquestionably corresponds to a telephone line, it is not thought that the claims of the patentee are limited to a subscriber's line. Upon the question of similarity of operation with the patent in suit, I quote from the testimony of the witness Dunbar:

"When, however, in response to a disconnecting signal from either subscriber's station, the operator at the right-hand exchange (who receives this signal over the clearing-out drop, $S^2$) removes plug, QQ', from the spring jack of the trunk line, thus opening the circuit battery, f, the supervisory relay, u, at the left-hand central office will be de-energized in precisely the same manner as it is de-energized in the patent in suit by the subscriber opening its circuit by replacing his telephone upon its hook. Said relay releases its armature, v, thus closing the local circuit, including the supervisory lamp, w, and battery, k. Said supervisory lamp will thus light and indicate to the operator a positive disconnecting signal. Said operator will then remove the plug, oo', from the spring jack, and will replace it in its normal seat or resting place, as shown in Fig. 1, thus opening the local circuit at point, $o^2$, and extinguishing the supervisory lamp."

It will be observed that according to the defendants' contention the sole difference between the O'Connell patent and the patent in suit is that in the latter a local supervisory circuit is shown, having a registering contact operated or closed by inserting a plug in the spring jack, while in the O'Connell system to close the registering contact the plug which is associated with it is raised from its seat and inserted in the spring jack. Apparently the mere lifting of the plug preparatory to its insertion in the spring jack closes the registering contact. The weight of the evidence from which the court has freely quoted, shows that there was no novelty in the patentee's method of closing the registering contact, and that the methods are equivalents accomplishing the same result. This O'Connell patent, as already mentioned, is the defendants' best reference. Considerable time was occupied at the hearing, and much discussion is found in the briefs, pointing out its differentiating and similar features to the patent in suit. That O'Connell prepared the way for adapting the disconnecting lamp signal to the subscriber's line cannot be seriously controverted. Steps forward in the art of telephony are but natural results of the persever-

ing experimenting of the many skilled electricians constantly engaged in adjusting and adapting familiar principles to new objects and uses. Every advance is not entitled to patentable distinction.

Careful consideration has been given all the evidence, and especially that of Prof. Jackson, Mr. Dunbar, and Mr. Dean, upon the questions of anticipation and want of invention. These defenses are established by preponderating evidence. The substitution by the complainant as a supervisory signal organization of the familiar line signal organization, for the foregoing reasons, has not sufficient merit to entitle it to the protection of the patent law. The presumption of validity to which the patent is entitled by virtue of its issuance is outweighed, and the Scribner & McBerty patent, though of superior utility, is nevertheless devoid of invention. My conclusion is that the application of the principle of the O'Connell patent to the subscriber's line was a mere improvement, without involving the exercise of inventive faculty.

Other questions presented on argument need not be considered. The bill should be dismissed, with costs